# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### August 2, 2011 Session

## THERON DAVIS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-28041      James M. Lammey, Jr., Judge**

---

**No. W2010-01607-CCA-R3-PC  - Filed December 16, 2011**

---

A Shelby County jury found the Petitioner, Theron Davis, guilty of attempted second degree murder and especially aggravated robbery, and the trial court sentenced him to an effective sentence of thirty-five years in the Tennessee Department of Correction.  The Petitioner appealed, and this Court affirmed the convictions in *State v. Theron Davis*, No. W2002-00446-CCA-R3-CD, 2003 WL 21339000, at *13 (Tenn. Crim. App., at Jackson, May 28, 2003), *perm. app. denied* (Tenn. Oct. 6, 2003).  The Petitioner filed a petition for post-conviction relief, which the post-conviction court denied after a hearing.  On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because he received the ineffective assistance of counsel.  After a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ., joined.

Robert Brooks, Memphis, Tennessee, for the appellant, Theron Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Amy P. Weirich, District Attorney General; Stacy M. McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Trial

This case arises from the Petitioner's robbery and repeated shooting of the owner of

a Memphis jewelry store. Based on this conduct, a Shelby County grand jury indicted the Petitioner for especially aggravated robbery and attempted first degree murder. On direct appeal, this Court summarized the underlying facts of the case as follows:

Shortly after 10:00 a.m. on December 28, 1999, the [Petitioner], Theron Davis, and a codefendant, Herman Spencer, entered the Summer Avenue jewelry store of the victim, Gary Smallwood, and asked to be shown some diamond rings. After the victim retrieved the jewelry from the store safe, the [Petitioner] pointed a gun at his face and ordered him down onto the floor. The [Defendant] then dumped the contents of a trash can on the victim's head, removed the plastic liner from the can, and began emptying jewelry from the store's display cases into the liner, while Spencer occupied himself in a similar fashion at other display cases using a liner taken from another trash can. At one point during the ten to twelve minutes the victim estimated he spent on the floor during the robbery, the [Petitioner] caught him looking at him and ordered, "Don't look at me, bitch."

The victim knew that his store's surveillance camera was broken at the time of the robbery. However, when one of the robbers asked him about the surveillance tape, he told them that he would have to show them where it was, as he could not describe its location. Ordered by the [Petitioner] to "get it," the victim stood up and began walking to a back storage room, followed by both robbers. When the victim passed through a doorway, he attempted to slam the door shut behind him, but was prevented from doing so by the robbers, who pushed together against the door. The victim explained that he feared the robbers were going to kill him:

I was very nervous. I just-I assumed that they were going to just kill me because I didn't-I didn't have the tape. And I wasn't going to give it to them if I did have it. And I tried to close the door behind me. And they were pushing back, both of them. And they were hollering. So I-I ran to the-to the back area to get out the back door.

As the gun-wielding [Petitioner] chased the victim to the back door, the victim heard Spencer screaming, "Kill him. Kill him. Kill him." The victim reached the back exit, threw the wooden security bar up, and opened the door, but the [Petitioner] shot him in the back before he could escape. The victim testified he made it out the door, but tripped over some wooden pallets lying on the ground outside. As he struggled to get up, the [Petitioner] stood over him and shot him again in the hip. At that point, firefighters from

a fire station across the street ran to the victim's assistance, and the [Petitioner] and Spencer fled the scene carrying the bags of jewelry. The victim received immediate emergency medical treatment at the scene from one of the firefighters who was also an emergency medical technician, and an ambulance arrived within minutes to transport him to the Regional Medical Center (the "Med"), where he was hospitalized for over a month, including almost one week in the intensive care unit. After his discharge from the hospital, he required the aid of a home health worker for an additional month.

A short time after the robbery, an anonymous "Crimestoppers" tip led police to develop the [Petitioner] and Spencer as suspects in the case. Thereafter, Sergeant Investigator Michael Jeffrey Clark of the Memphis Police Department went to the intensive care unit of the Med and showed the victim photographic spreadsheets, from which he positively identified the [Petitioner] as the man who shot him and Spencer as his accomplice. Because the victim was on a ventilator at the time and unable to speak, Sergeant Clark worked out a communication system whereby the victim indicated "yes" by raising one finger and "no" by raising two fingers. Sergeant Clark, who had been promoted to lieutenant by the time of the [Petitioner]'s suppression hearing, testified at both the suppression hearing and at trial that the victim pointed to the [Petitioner]'s and Spencer's photographs without any hesitation, and with no prompting from him or anyone else in the room. He acknowledged he asked the victim before showing him the photographs if he understood that he could die from his injuries, and explained he did so because he hoped that, in the event the victim did not survive, any identification the victim made would be admissible as a dying declaration. The victim testified at trial that he had been one hundred percent confident in the identifications he made in the hospital, and he was certain "[b]eyond a shadow of a doubt" that the [Petitioner] was the man who shot him.

The [Petitioner] and Spencer were later arrested at a motel in Marshall County, Mississippi, and taken to the county jail, where the [Petitioner] gave an initial statement to Sergeant Clark denying any involvement in the robbery and offering an alibi, which, upon investigation, failed to check out. Shortly thereafter, the [Petitioner] and Spencer waived extradition and were transported back to Tennessee. During the trip, the [Petitioner] spontaneously began to confess his role in the robbery, and, after being informed of his rights, told the officers transporting him that he could show them the location of the jewelry. However, when the officers drove the [Petitioner] to that location to meet investigators, no jewelry was found. The [Petitioner] was

then taken to the robbery division headquarters, where he was again advised of his rights and signed a waiver of rights form before giving a detailed, written confession to the crime. In his confession, the [Petitioner] said he shot the victim out of panic when the victim attempted to escape, he was sorry he shot the victim, and he never intended to kill the victim.

. . . [T]he [Petitioner] testified, denying his involvement in the crimes and saying that the statement he had given confessing his role in the crimes had been coerced by police officers who not only struck him, but also told him that he would be released within six months if he made his account of the crimes match that provided by his codefendant. He said the police officer who took his statement supplied all the words, with the exception of his expression of remorse that the victim had been shot. The [Petitioner] insisted he had never robbed anyone and said the police fabricated and forced him to sign the statement because he was a drug dealer and lived a criminal lifestyle. He also offered an alibi, different from the one he had given Sergeant Clark in Mississippi, which was corroborated by Jesse James Brown who testified he and the [Petitioner] had been at the [Petitioner]'s house when the robbery occurred.

*Theron Davis*, 2003 WL 21339000, at *1-2. The jury convicted the Petitioner of especially aggravated robbery and attempted second degree murder. The trial court sentenced him to consecutive terms of twenty-three years at 100% for the especially aggravated robbery conviction and twelve years at 30% for the attempted second degree murder conviction for a total effective sentence of thirty-five years in the Tennessee Department of Correction.

## B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel. The post-conviction court held an evidentiary hearing wherein it heard the following evidence:[1] The Petitioner testified that he was represented by Counsel and Co-counsel. The Petitioner said that Michael Robins represented him during his suppression hearing. The Petitioner said that Counsel failed to meet with him other than at court dates. The Petitioner said that when he told Counsel about alibi witnesses, Counsel "rejected it." He said Counsel "never took [him] serious." The Petitioner said that he was

---

[1] In his petition for post-conviction relief, the Petitioner alleged several issues in which he asserted Counsel was ineffective. On appeal, however, he maintains only two of these, that Counsel failed to object to the photographic line up as unduly suggestive and Counsel failed to argue that his convictions violated the "same evidence" test. As such, we omit claims asserted within the petition for post-conviction relief and testimony concerning allegations of ineffectiveness that the Petitioner does not maintain on appeal.

surprised when Michael Robins announced at the suppression hearing that there was "no factual basis for which we can raise a matter of defense." The Petitioner testified that, before trial, he provided Counsel with the name of an eyewitness to the robbery, Tavarius Jackson. The Petitioner explained that he met Jackson in jail, and the two began to discuss the Petitioner's case. Jackson told the Petitioner that he knew about the robbery because he had witnessed it and that he was willing to testify on the Petitioner's behalf. When the Petitioner informed Counsel of this witness, the Petitioner said that Counsel responded that suppression of the victim's identification was the best strategy because juries do not find jailhouse witnesses credible.

The Petitioner testified that neither Counsel nor Co-counsel discussed a defense strategy with him. Rather, they encouraged him to accept the State's offer of twenty-five years to be served at 100%. The Petitioner said that the arguments made on his behalf at the suppression hearing were never discussed with him. The Petitioner confirmed that Counsel sought to be relieved from representation before his trial. The Petitioner testified that Counsel "came in and told me if I force him to go on with this hearing and the judge make him stay on my case, I'm going to regret it. Those are his exact words." The Petitioner speculated that Counsel wanted to be relieved due to the Petitioner's failure to make full payment for Counsel's services. The trial court denied Counsel's motion to withdraw.

The Petitioner testified that Counsel was ineffective for failing to adequately raise the issue of the photographic line up. At the suppression hearing, the defense argued that the procedure was unduly suggestive because the victim was hospitalized and being treated for the gunshot wounds. The Petitioner said Counsel was ineffective for failing to argue that the photographic line up was suggestive because the Petitioner was the only one in the photographic line up wearing jewelry. The Petitioner said that, prior to the suppression hearing, his attorneys never discussed the photographic identification with him. In describing the overall communication throughout his case the Petitioner said, "[There] wasn't none," maintaining that he only saw Counsel at court appearances and Counsel and Co-counsel on the day of trial.

On cross-examination, the Petitioner agreed that the victim identified the Petitioner in the courtroom at trial. The victim also testified at trial that he had seen the Petitioner several times before the day of the robbery and shooting. The Petitioner agreed that he had been in the jewelry store before the day of the robbery and shooting.

The Petitioner testified that he decided that Counsel's performance was deficient on the day Counsel sought to withdraw, which was before the Petitioner's trial. The Petitioner said he could not remember whether he wrote letters commending Counsel on his work after his trial. The State provided the Petitioner with letters written to Counsel and Co-Counsel

-5-

complimenting their work. The Petitioner identified his signature on the letters but denied that the handwriting in the body of the letters "look[ed]" like his handwriting.

The Petitioner agreed that he did not have the eyewitness to the robbery, Tavarius Jackson, in court to testify at the post-conviction hearing. The Petitioner said that he did not know Jackson's location at the time of the post-conviction hearing, and that he did not know Jackson's date of birth, address, or social security number.

Counsel testified that the Petitioner's mother retained him to represent the Petitioner. When asked whether Counsel had contact with the Petitioner during the representation, Counsel responded:

> My office had contact with [the Petitioner]. One of the things that's different at my office is we're not a group of lawyers that share expenses. We're a group of lawyers that work as a team for the firm. And so we would have different lawyers seeing [the Petitioner] at different times. For example, Mr. Robins, Mike Robins, an attorney of many years experience conducted the Motion to Suppress. He saw [the Petitioner] on occasion. Ms. McClusky did the trial primarily in this. I sat as second seat in that trial. So we . . . all worked together toward a common end so that [the Petitioner] would have stronger representation.

Counsel testified that entries on his file indicated he provided a copy of discovery to the Petitioner on January 18, 2001; he met with the Petitioner on January 29, 2001; he played the preliminary hearing tape for the Petitioner on February 6, 2001; and he met with the Petitioner's mother on April 16, 2001. Counsel said that he met with the Petitioner numerous other times as the Petitioner had indicated at trial during the *Momon* hearing. Counsel read the following portion of the transcript from the *Momon* hearing:

> Co-counsel: Now, each time we met with you we talked about possible defenses. Do you remember those meetings?
>
> Petitioner: Yes, ma'am.
>
> Co-counsel: And we've met with you many times to talk about these things, haven't we?
>
> Petitioner: Yes, ma'am.
>
> Co-counsel: And you've gotten copies of what we have in the case; is

-6-

that correct?

Petitioner:    Yes, ma'am.

Co-counsel:    The discovery, you remember getting packages from us? And when we would meet with you us handing you packages of paper?

Petitioner:    Yes, ma'am.

Co-counsel:    And we'd go over those things?

Petitioner:    Yes, ma'am.

Co-counsel:    And some of those things were statements by other persons?

Petitioner:    Yes, ma'am.

Co-counsel:    And some were reports by officers?

Petitioner:    Yes, ma'am.

Co-counsel:    And you got all that?

Petitioner:    Yes, ma'am.

Co-counsel:    And you've gone over all that?

Petitioner:    Yes, ma'am.

Co-counsel:    And so you've got all the information and we've reviewed it with you, haven't we?

Petitioner:    Yes, ma'am.

Counsel testified that the Petitioner provided the name of his girlfriend, Rostin Deangelo, as an alibi witness. Counsel reviewed Deangelo's police statement which indicated that she was with the Petitioner on the night of the robbery, but the Petitioner had taken her home at 9:00 p.m. The robbery and shooting occurred "somewhere around 10:00

p.m." so Counsel was unable to use Deangelo as an alibi witness. When Counsel discussed the problem with using Deangelo as an alibi, the Petitioner said there was a different alibi witness, "Tony," but the Petitioner did not know his full name. Shortly before the Petitioner's trial on these charges, the Petitioner's brother brought a witness, Jesse Brown, to Counsel's office. Counsel testified that, even though late, the trial court allowed Brown to testify at trial.

Counsel provided the following summary of the Petitioner's case and the evidence against him:

> This was a difficult case. In that, we not only had [the victim] identifying [the Petitioner] but we also had a confession, an alleged confession by [the Petitioner]. In addition, there was statements by his brother to police that he . . . saw Herman who was the co-defendant in this case, Herman Spencer I think his name was, and [the Petitioner] at the house right afterwards with rings on top of what appeared to be these trash can containers . . . . And that's what [the victim] said trash was emptied out of and they took the liners out of the trash cans, put the jewelry in them and after they shot him, fled the scene. So his brother said he saw that. Herman Spencer gave a statement that they participated and that [the Petitioner] was, as I recall, was the . . . shooter. . . . Mr. Jones, he was supposed to take part I believe. And he kind of chickened out or he was going to be a lookout or something and he heard shots and left, but they called him Pooky. That was his nickname. They talked [ ] about [him] being Pooky. And that - - so he was involved and gave statements to the police.

Counsel explained that, based on the proof against him, he did not believe the Petitioner needed to go to trial. Counsel said that the Petitioner did not want to accept the State's offer of twenty-five years to settle this case and another felony charge against the Petitioner. Counsel said that, given the proof in the case, the only defense strategy was to attempt to discredit the victim and to provide supporting facts to show the Petitioner's statement was coerced.

Counsel testified that he did not request that possible fingerprints obtained at the scene be processed. He explained that the Petitioner's position was that he was not present so Counsel did not believe the Petitioner would benefit from such a request.

Jim Hill, a Memphis Police Department latent print examiner, testified that he examined fingerprint evidence from the Defendant's case. Hill testified that none of the fingerprints taken from the scene matched to the Defendant.

Co-counsel testified that she met with the Petitioner and discussed the charges and possible defense with him. Co-counsel recalled that the Petitioner's position was that he was not present during the robbery and that he had an alibi. The first alibi witness the Petitioner provided was his girlfriend, but she could not provide an alibi for the Petitioner. Next, the Petitioner offered Herman Spencer as an alibi witness. Co-counsel explained to the Petitioner that, because Spencer was a co-defendant in the case, Spencer would be a "very difficult alibi person to rely upon." The Petitioner offered the last alibi witness shortly before trial. The Petitioner told Co-counsel that "Tony" "watched his back," but the Petitioner could not provide "Tony's" last name. The Petitioner told Co-counsel that his family would try to find "Tony." The Petitioner's brother brought a witness to Co-counsel's office that she assumed would be "Tony," but it was another witness, Jesse Brown. Co-counsel said that Jesse Brown testified at the Petitioner's trial. Co-counsel testified that the Petitioner never mentioned an eyewitness to the robbery.

Co-counsel testified that she did not recall hiring an investigator for this case but that she did visit the crime scene. Co-counsel said that she met with the Petitioner in jail but could not recall how many times. Co-counsel said that the Petitioner was frustrated he had been charged, but she did not recall him being frustrated with her representation. Co-counsel said that she was aware police lifted fingerprints from the crime scene. She said she did not attempt to have the prints processed because the Petitioner admitted he had been in the jewelry store before, and she did not want to risk a fingerprint match to the Petitioner. Co-counsel agreed that, in the photographic line up, the Petitioner is the only person wearing visible jewelry. Co-counsel said that she did not request the victim's medical records.

On cross-examination, Co-counsel testified that she investigated all information given to her about different alibi witnesses. Co-counsel explained her decision not to ask the trial court to dismiss the Petitioner's cases based upon the theory that the murder charge was incidental to the robbery charge. The Petitioner referred to *State v. Anthony,* 817 S.W.2d 299 (Tenn. 1991), in support of his argument and, after reviewing the case and conducting research, Co-counsel found that the case was narrowly construed to kidnapping and some rape cases, so it would not be applicable in the Petitioner's case. Co-counsel testified that she did not believe Hill's testimony, that the Petitioner's prints were not recovered at the scene, would have changed the outcome of the Petitioner's trial in light of the evidence against the Petitioner. Co-counsel testified that, after the victim's testimony at trial, the Petitioner told her that the victim "was prejudiced because [the Petitioner] shot him."

Based upon this testimony, the post-conviction court denied post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends the post-conviction court erred when it dismissed his petition because: (1) Counsel failed to suppress the victim's identification of the Petitioner on the basis that the photographic line up itself, and not just the procedure, was unduly suggestive; and (2) Counsel failed to argue that the Petitioner's convictions for both attempted second degree murder and especially aggravated robbery are in violation of due process and Double Jeopardy.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419

(Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. "Unduly Suggestive" Identification Procedure

Before trial, the Petitioner filed a motion to suppress the victim's identification of the Petitioner in a photographic line up because the circumstances surrounding the identification were suggestive. The trial court denied the Petitioner's motion and, on direct appeal, the Petitioner raised the issue of the denial of his motion. This Court affirmed the trial court's denial of the motion and the Petitioner now maintains that Counsel was ineffective for failing to properly argue the motion to suppress. The motion to suppress asserted that the procedures used by police during the identification were unduly suggestive. The Petitioner claims that Counsel should have instead argued that the photographic line up itself was unduly suggestive because the Petitioner was the only person depicted in the line up wearing jewelry. Further, the victim described the perpetrator as slim, and the Petitioner contends that he is the "slimmest individual" in the line up.

The trial court made the following findings when it denied the Defendant's motion to suppress the photographic line up based upon the procedure used:

> This Court has also examined the photospread given in this case, and the facts surrounding the identification process at the hospital, and finds nothing suggestive about the photospread or the process used which might reasonably lead to a misidentification. This Court has considered as well the factors listed in *Neil v. Biggers*, 93 S. Ct. 375 (1972), as applied to photospreads in *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998), and the testimony at trial of Mike Turberville [sic], who witnessed Lt. Clark administer the photospread, and saw the victim indicate the [Petitioner], without suggestion or hesitation.

On direct appeal, a panel of this Court affirmed the trial court's findings and concluded that the photographic line up was not impermissibly suggestive. This Court reviewed the photographic line up and noted that "The other individuals shown in the same spreadsheet with the [Petitioner] all have similar skin tone, facial features, and hairstyles." *Theron Davis*, 2003 WL 21339000, at *6.

At the conclusion of the post-conviction hearing, the post-conviction court denied the Petitioner relief as to this claim and made the following findings:

> The issue of identity, I've looked at this photospread, although there does seem to be a medallion around the [Petitioner]'s - on the photograph pertaining to . . . the [P]etitioner, it doesn't appear that that photospread was unduly suggestive in any way. Furthermore, that issue was taken up - it was suggested to the trial court judge that it was unduly suggestive. The trial court judge disagreed. The Criminal Court of Appeals disagreed that it was unduly suggestive.

-12-

So, I see no real issue in the identification process involving the photospread. But even assuming that the photospread had been suppressed, I don't believe that that would affect the testimony at trial - the identification made at trial.

We conclude that the record supports the post-conviction court's findings of fact. Upon review of the record, we further conclude that the Petitioner has failed to establish by clear and convincing evidence that Counsel was ineffective for arguing that the line up itself was suggestive. The trial court, this Court, and the post-conviction court all found that the photographic line up was not unduly suggestive. Therefore, Counsel is not ineffective for failing to argue that the line up itself was unduly suggestive. Furthermore, assuming the photographic line up was unduly suggestive and had been suppressed, the victim, nonetheless, identified the Petitioner in court. The co-defendant made a statement indicating the Petitioner was the shooter, and the Petitioner also made a statement to police, admitting he shot the victim. In light of this evidence, the Petitioner has failed to show how Counsel's failure to argue that the line up was unduly suggestive prejudiced the Petitioner. The Petitioner is not entitled to relief as to this issue.

### B. Multiple Punishments for the Same Offense

The Petitioner asserts that Counsel failed to argue that his convictions for both attempted second degree murder and especially aggravated robbery are in violation of the Due Process and Double Jeopardy clauses of the federal and state constitutions because the attempted second degree murder conviction is incidental to the especially aggravated robbery conviction. In making this argument, the Petitioner relies upon *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991). The State responds that convictions for attempted second degree murder and especially aggravated robbery do not violate the Due Process or the Double Jeopardy clauses.

In denying the Petitioner relief, the post-conviction court found the following:

[T]he present case is distinguishable from *State v. Anthony*, where the Tennessee Supreme Court held that a defendant may not be convicted of both armed robbery and kidnapping, if the detention was short in duration and merely incidental to the commission of the robbery.

In the present case, Petitioner was not charged with kidnapping. The crime of attempted murder is not necessarily incidental to the especially aggravated robbery. There are numerous factual scenarios where someone could be guilty

-13-

of especially aggravated robbery without being guilty of attempted first, or even attempted second degree murder. As such, the Petitioner has failed to show that Counsel was defective for failing to seek dismissal of the indictment for attempted first degree murder. Therefore this claim must fail.

The Tennessee Supreme Court, in *State v. Anthony*, held that due process under our state constitution prohibited convictions for both kidnapping and another felony when the kidnapping was essentially incidental to the accompanying felony. 817 S.W.2d at 306-307. In discussing the application of due process, the Court was confronted with cases in which the crime of kidnapping would always be proven by proving the accompanying felony. The Court questioned, absent clear legislative intent to the contrary, the fundamental fairness of allowing two convictions under those circumstances without a showing that the two offenses were factually distinct. In determining when two convictions could stand, the Court noted that one method of resolution dealt with whether the defendant's conduct "substantially increased the risk of harm over and above that necessarily present" for the accompanying felony. *Id.* at 306.

Unlike the convictions in the *Anthony* case, in the present case, a murder attempt is not always shown by proving an especially aggravated robbery. In fact, neither of the Petitioner's convictions are necessarily incidental to the other. Thus, due process concerns as they relate to multiple convictions from one episode are not present in this case.[2] As this issue relates to Counsel's failure to raise this issue, we conclude that the Petitioner has failed to show that Counsel was ineffective for failing to request the indictments be dismissed on these grounds and that the Petitioner was prejudiced by Counsel's conduct. The Petitioner is not entitled to relief as to this issue.

The Petitioner, on appeal, challenges his convictions as a violation of the Double Jeopardy Clause. The State responds that, because the Petitioner raises this issue for the first time on appeal, he has waived this argument. Because the Petitioner's general argument is that the Defendant was unfairly punished twice for the same offense, we will address this issue even though the Petitioner specifically raises a Double Jeopardy argument for the first time on appeal.

---

[2] We note that at least one panel of this Court has decided that the teachings of *Anthony* have no application to convictions for attempted murder and especially aggravated robbery as neither crime is necessarily incidental to the other. *State v. Frank B. Jackson, Jr. and Robert Joe Randolph*, No. 03C01-9206-CR-00222, 1993 WL 285949, at *3 (Tenn. Crim. App., at Knoxville, July 29, 1992), *perm. app. denied* (Tenn. Nov. 1, 1993).

The Double Jeopardy Clause protects (1) against a second prosecution for the same offense after acquittal, conviction, or other trial resolution not caused by manifest necessity and (2) against multiple punishments for the same offense. *See North Carolina v. Pearce*, 89 S. Ct. 2072, 2076 (1969); *United States v. Johnson*, 584 F.2d 148, 153 (6th Cir. 1978), *cert. denied*, 440 U.S. 918 (1979). When the issue, as in this case, relates to the imposition of multiple punishments and not to successive prosecutions, the analysis focuses completely upon determining whether the legislature intended that multiple punishments could be imposed for the same conduct. *See, e.g.*, *Missouri v. Hunter*, 103 S.Ct. 673, 679 (1983); *Albernaz v. United States*, 101 S. Ct. 1137, 1143 (1981). In conducting this analysis, the United States Supreme Court adopted a rule of statutory construction to assist in determining whether two offenses or only one was intended by the legislature. In *Blockburger v. United States*, the Court stated, "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 52 S. Ct. 180, 182 (1932). In discussing the application of the test, the United States Supreme Court has stated the following:

> The test articulated in *Blockburger v. United States*, 52 S. Ct. 180 (1932), serves a generally similar function of identifying congressional intent to impose separate sanctions for multiple offenses arising in the course of a single act or transaction. In determining whether separate punishment might be imposed, *Blockburger* requires that courts examine the offenses to ascertain "whether each provision requires proof of a fact which the other does not." *Id.*, at 182. As *Blockburger* and other decisions applying its principle reveal . . . the Court's application of the test focuses on the statutory elements of the offense.

*Iannelli v. United States*, 95 S. Ct. 1284, 1293 n.17 (1975).

In *State v. Denton*, the Tennessee Supreme Court considered multiple punishment cases and concluded that resolution of this issue under the Tennessee Constitution requires: (1) a *Blockburger* analysis of the statutory offenses; (2) an analysis of the evidence used to prove the offenses; (3) consideration of whether there were multiple victims or discrete acts; and (4) a comparison of the purposes of the respective statutes. 938 S.W.2d 373, 381 (Tenn. 1996). The Court further held that "none of these steps is determinative; rather the results of each must be weighed and considered in relation to each other." *Id.*

Pursuant to T.C.A. § 39-12-101(a), a person commits a criminal attempt by acting with the culpability required for the offense attempted and (1) intentionally engages in action or causes a result that would constitute an offense or (2) acts with an intent to complete a

course of action or cause a result that would constitute the offense. First degree murder entails the "intentional, premeditated and deliberate killing of another." T.C.A. § 39-13-202(a)(1) (2010). Second degree murder entails the knowing killing of another. T.C.A. § 39-13-210(a)(1) (2010). Especially aggravated robbery is one that is accomplished with a deadly weapon and results in the victim suffering serious bodily injury. T.C.A. § 39-13-403 (2010).

Especially aggravated robbery requires the taking of the property of another, the use of a deadly weapon, and the resulting serious bodily injury. *Id.* Unquestionably, neither robbery nor the use of a deadly weapon is necessarily proven by proving the elements needed for first degree or second degree murder. Conversely, an intentional or knowing killing of another is not necessarily proven by proving the elements of especially aggravated robbery. Thus, under the *Blockburger* test, especially aggravated robbery is not the same offense as either grade of murder.

The State did not rely on the same evidence to prove both crimes. The evidence supporting the Petitioner's especially aggravated robbery conviction is that the Petitioner entered the victim's jewelry story armed with a weapon to rob the store. During the course of the robbery, the Petitioner used his weapon and, as a result, the victim sustained serious bodily injury. The facts supporting the Petitioner's attempted second degree murder conviction are that the victim attempted to escape and the Petitioner chased the victim while his co-defendant yelled, "Kill him. Kill him. Kill him." The Petitioner shot the victim in the back and when the victim fell on the ground, the Petitioner then stood over him and shot the victim again.

Although there is only one victim in this case, the proof includes several discrete acts, some of which pertain only to the robbery while others are pertinent only to the attempted murder. And, finally, the legislative purpose behind the especially aggravated robbery is to protect against armed robberies resulting in injury to an innocent party. The purpose behind second-degree murder is to protect against unlawful killings.

Our review of this case under the *Denton* criteria reveals that the Petitioner's convictions for especially aggravated robbery and attempted second degree murder do not violate the Double Jeopardy Clause. *See also State v. Zirkle*, 910 S.W.2d 874, 890 (Tenn. Crim. App. 1995) (holding that dual convictions for especially aggravated robbery and first degree murder do not violate double jeopardy protections); *State v. Oller*, 851 S.W.2d 841, 842 (Tenn. Crim. App. 1992) (holding that defendant could be convicted of both murder and especially aggravated robbery based on serious bodily injury to the victim); *State v. Ronald B. Waller*, No. 03C01-9212-CR-00429, 1993 WL 398452, at *7 (Tenn. Crim. App., at Knoxville, Oct. 6, 1993) (affirming convictions for murder and especially aggravated

robbery), *perm. app. denied* (Tenn. Feb. 7, 1994).  Based upon this conclusion, the Petitioner has failed to show that Counsel's representation was deficient in this respect.  The Petitioner is not entitled to relief as to this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief.  Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE